## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN BIRD CONSERVANCY,<br>4301 Connecticut Ave., NW,<br>Washington, DC 20008,<br><br>and<br><br>BLACK SWAMP BIRD OBSERVATORY,<br>13551 West State Route 2,<br>Oak Harbor, OH 43449,<br><br>*Plaintiffs*,<br><br>v.<br><br>DAN BROUILLETTE, Secretary,<br>U.S. Department of Energy,<br>1000 Independence Ave., SW,<br>Washington, DC 20585,<br><br>TODD T. SEMONITE, Lieutenant General,<br>U.S. Army Corps of Engineers,<br>441 G Street, NW,<br>Washington, DC 20314,<br><br>and<br><br>RYAN D. MCCARTHY, Secretary of the Army,<br>U.S. Department of Defense,<br>101 Army Pentagon,<br>Washington, DC 20310,<br><br>*Defendants*. | Civ. No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This action challenges the Department of Energy's ("DOE") and U.S. Army

Corps of Engineers' ("Corps") (collectively, "Defendants") funding and authorization of the

Icebreaker Wind Project ("Icebreaker Project" or "Project"), a first-of-its-kind proposed offshore

wind energy facility in Lake Erie with a price tag in excess of $40 million that is expressly intended to spur future development of offshore industrial wind energy in the Great Lakes Region and beyond.

2.     The Icebreaker Project is without precedent in the United States. It will be the first commercial offshore freshwater wind energy project *ever* constructed in the U.S., and only the second offshore project of any kind constructed in the western hemisphere.

3.     The Project is slated for construction in the heart of a formally designated Global Important Bird Area. By DOE's own estimate, it presents serious risks to millions of birds and bats per year that migrate through the Project area and/or utilize the biologically fertile waters of Lake Erie as feeding and breeding grounds.

4.     Given both the precedent-setting nature of the Project, and its serious adverse impacts on an ecologically critical area, the decision to fund and authorize the Project warranted rigorous environmental scrutiny. Yet, rather than conduct the robust examination that federal law required for this groundbreaking project that will fundamentally transform this freshwater ecosystem and pave the way to a substantial expansion of wind turbines in the Great Lakes, DOE has instead willfully ignored inconvenient data and shirked its obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347.

5.     The U.S. Fish and Wildlife Service ("FWS") is the federal agency with specialized expertise regarding wildlife and the biological threats associated with wind energy. Notwithstanding repeated calls from FWS for DOE to prepare an Environmental Impact Statement ("EIS") to evaluate the Icebreaker Project, DOE opted instead to review the Project using a far less rigorous Environmental Assessment ("EA"), and concluded from its truncated analysis that the Project would have no significant environmental impact.

6.      Even setting aside that the Project cries out for an EIS, DOE's Final EA cannot pass muster under NEPA. Among other things, DOE failed to consider any alternatives to the Project that could have significantly minimized avian mortality and mitigated the Project's impacts. DOE's cursory review fails under the terms of the statute and its implementing regulations and falls far short of DOE's duty to take a "hard look" at the full implications of its decision and alternatives to it.

7.      DOE's rush to fund the Icebreaker Project, along with its token consideration of its impacts, also contaminated the Corps' environmental analysis of the Project. Indeed, in permitting the Project under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, the Corps relied on data that FWS criticized as incomplete and flawed to conclude that Project construction is in the public's best interest. Additionally, far from giving serious consideration to whether the Project is the least environmentally damaging practicable alternative (a finding the Corps is legally required to make on the basis of clear and convincing evidence before it may grant a Section 404 permit), the Corps examined only the two alternatives presented in the Final EA—i.e., to fund the project or not. These flawed and cursory analyses cannot satisfy the Corps' duties under the CWA.

8.      This precedential project, that is expressly intended to serve as the benchmark for over a thousand future offshore turbines in Lake Erie, cannot be permitted to proceed on the basis of fatally flawed environmental review processes. Accordingly, the Court should hold that Defendants' inadequate environmental evaluation of the Project violates NEPA, the CWA, and the Administrative Procedure Act ("APA").

## JURISDICTION

9.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal

question) and 28 U.S.C. § 1346 (United States as a defendant).

## PARTIES

10.     Plaintiff American Bird Conservancy ("ABC") is a national non-profit

membership organization whose mission is to conserve native birds and their habitats throughout

the Americas. Its principal offices are in Washington, D.C. and The Plains, Virginia. Founded in

1994, ABC works to reduce threats to birds from habitat destruction; collisions with buildings,

communication towers, and wind turbines; predation by non-native species such as feral cats;

and toxins such as hazardous pesticides and lead. ABC seeks to achieve these objectives through

scientific research and analysis; advocating for bird conservation at the local, state, regional, and

federal levels; forming bird conservation partnerships; and pressing for regulatory changes to

address these threats effectively.

11.     ABC's "Bird-Smart Wind Energy Program" addresses the threats from wind

energy development that do not adequately consider potential impacts on birds, especially those

deemed "Threatened" or "Endangered" under the Endangered Species Act ("ESA"), and

important bird habitats. ABC supports the development of wind power and other renewable

energy resources, but it recognizes a vital public interest in ensuring that they do not needlessly

place birds at risk. The rapid development of the wind industry and proliferation of massive wind

turbines has already posed a serious threat to eagles, other migratory birds, and other wildlife.

This is particularly true in ecologically sensitive locations and other areas where wind energy

projects are likely to kill large numbers of migratory birds and other wildlife, or destroy and

otherwise disrupt their habitat. Accordingly, "Bird-Smart" wind energy is an important part of

4

the renewable energy solution to climate change, and requires careful site selection, effective operational and compensatory mitigation, and ongoing bird mortality monitoring.

12.    ABC regularly submits comments during federal regulatory processes applicable to wind energy projects, both with regard to general policies bearing on wind power and bird impacts, and on individual projects and permit decisions that pose excessive threats to birds. ABC submitted extensive comments on DOE's proposal to fund the Icebreaker Project. If allowed to proceed, the Project will impair the interests of ABC and its members who observe, study, enjoy, and otherwise derive scientific, recreational, aesthetic and other benefits from birds in the area where the Icebreaker Project turbines will be built. In addition, construction of the Icebreaker Project turbines will establish a precedent that significantly increases the risk that other wind power projects, including those currently under consideration, will in fact be constructed in major migratory bird corridors and in locations occupied by ESA-listed species and bald and golden eagles. The expansion of wind power in this area of vital importance to migratory birds impairs the interests of ABC members, ABC officers, and staff who view birds in the vicinity of the proposed turbines for recreational, scientific, aesthetic, and other purposes.

13.    Plaintiff Black Swamp Bird Observatory ("BSBO") is a nonprofit membership organization focused on promoting conservation through birding in Ohio on the shores of Lake Erie and adjacent to the Lake Erie Central Basin Important Bird Area. It was founded in 1992 by biologists studying bird migration who recognized the need for an organization to help disseminate their research findings. BSBO's long-term research projects have helped to develop a greater understanding of bird migration and the habitat needs of songbirds, raptors, shorebirds, and rails. BSBO data have been used to assist both private and governmental land owners in better managing their properties for migratory bird species.

14.     BSBO's education and outreach programs have received national accolades. Its strong focus on youth education is highlighted by its Wetland Investigation Network program, which offers students in grades K-12 a day-long exploration of the entire marsh ecosystem. Its highly-acclaimed Ohio Young Birders Club for youth ages 12-18 encourages and educates young conservation leaders and serves as a model program for many other state-wide youth birding clubs.

15.     BSBO also promotes conservation and economic development through birding by hosting The Biggest Week in American Birding—an annual ten-day birding festival coinciding with the peak of songbird migration in early May. The event raises awareness and appreciation for birds and habitat conservation, and also markets this unique migratory area to birders around the world. In 2019 alone, 90,000 birders from all 50 states and 52 countries visited the area just to watch birds, spending more than $40 million in the area from mid-April to mid-May.

16.     If allowed to proceed, the Icebreaker Project will impair the interests of BSBO and its members who observe, study, enjoy, and otherwise benefit from birds that reside in or migrate through the area where the Project will be built and will kill, disturb, and/or harass birds in this unique migratory area. The Project will also harm BSBO and its members by establishing a precedent that will significantly increase the risk that wind power projects, including those currently under consideration, will in fact be constructed in major migratory bird corridors and in locations occupied by migratory birds, ESA-listed species, and bald and golden eagles. The construction of the Icebreaker Project, which will kill many migratory songbirds and raptors, will directly impair the interests of BSBO members, BSBO officers, and staff who view birds for recreational, scientific, aesthetic, and other purposes.

17.     Defendant Dan Brouillette is the Secretary of DOE and is directly responsible for the supervision, management, and control of DOE. Accordingly, he is ultimately responsible for overseeing DOE's decision challenged in this action and is sued solely in his official capacity.

18.     Defendant Todd T. Semonite is the Lieutenant General of the Corps and is directly responsible for the supervision, management, and control of the Corps. Accordingly, he is responsible for overseeing the Corps' decision challenged in this action and is sued solely in his official capacity

19.     Defendant Ryan D. McCarthy is the Secretary of the Army and is ultimately responsible for overseeing the work of the Corps, an agency within the Department of the Army. He is sued solely in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     The National Environmental Policy Act

20.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b), (c).

21.     The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500–1508, which are "binding on all federal agencies." *Id.* § 1500.3.

22.     To accomplish its underlying goals, NEPA requires federal agencies to prepare a "detailed statement"—i.e., an EIS—for all "major federal actions significantly affecting the

quality of the human environment." 42 U.S.C. § 4332(c). An EIS must describe (1) "the environmental impact of the proposed action," (2) "the adverse environmental effects which cannot be avoided," and (3) "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i)–(iii). By definition, the environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. 40 C.F.R. § 1508.8(b).

23.     Each EIS must consider the underlying federal "purpose and need" for the proposed action, and "rigorously explore and objectively evaluate" the environmental impacts of "*all* reasonable alternatives" to the proposed action. 40 C.F.R. §§ 1502.13, 1502.14 (emphasis added). NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

24.     NEPA requires that, in evaluating the alternatives of a proposed action, agencies take a "hard look" at the effects of the proposed action as compared to all reasonable alternatives. *See* 40 C.F.R. §§ 1502.1, 1502.16. The EIS must assess the direct, indirect, and cumulative impacts of the proposed action, including adverse environmental effects that cannot be avoided. *Id.* § 1508.25. Direct effects are those "caused by the action and occur at the same time and place," while indirect effects are those "caused by the action" that occur "later in time

or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8. Cumulative

impacts are those that result from the "incremental impact[s]" of the proposed action when added

to the impacts of other past, present, and reasonably foreseeable future actions, whether

undertaken by other federal agencies or private third parties. *Id.* § 1508.7. "Cumulative impacts

can result from individually minor but collectively significant actions taking place over a period

of time." *Id.*

25.     To aid in determining whether an EIS is required, the agency may prepare an EA

that analyzes the environmental impacts of the proposed action as well as its alternatives. 40

C.F.R. §§ 1501.4(c), 1508.9. Although less rigorous than an EIS, an EA must "include brief

discussions" analyzing direct, indirect, and cumulative impacts of the proposed action, as well as

alternatives to the action. *Id.* § 1508.9.

26.     In determining whether an EIS is required, an agency must consider whether the

proposed action has a "significant" effect on the human environment. 40 C.F.R. § 1508.27. The

"significance" determination is based on numerous factors, including the "[u]nique

characteristics of the geographic area such as proximity to historic or cultural resources, park

lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "the

degree to which the effects on the quality of the human environment are likely to be highly

controversial," "[t]he degree to which the possible effects on the human environment are highly

uncertain or involve unique or unknown risks," and "[t]he degree to which the action may

establish a precedent for future actions with significant effects." *Id.* § 1508.27(b). The presence

of any one of these factors requires the preparation of an EIS.

27.     If, in the course of preparing the EA, the agency determines that an EIS is not

required, it must issue a Finding of No Significant Impact ("FONSI") explaining the reasons why

the agency has determined that its proposed action "will not have a significant impact" on the environment. 40 C.F.R. § 1508.13.

28.     Public disclosure of information concerning an agency's proposed action, its impacts, and reasonable alternatives to the action is central to NEPA's statutory and regulatory scheme, regardless of whether an agency prepares an EIS or an EA. The CEQ regulations require that federal agencies "shall to the fullest extent possible . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment," and require agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id*. §§ 1500.2, 1506.6(a). Thus, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b). In short, "[a]ccurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

**B.      The Clean Water Act and Rivers and Harbors Act**

29.     The CWA is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA generally prohibits the discharge of pollutants, including dredged and fill material, into the waters of the United States unless authorized by a permit. *See id.* § 1311(a). The term "discharge of fill material" is defined as "the addition of fill material into the waters of the United States" or the placement of fill necessary for the construction of any structure in the waters of the United States. 33 C.F.R. §§ 323.2(f), 323.3(c); 40 C.F.R. § 232.2.

30.     Section 404 of the CWA authorizes the Corps to issue permits for the discharge of dredge or fill material into waters of the United States. 33 U.S.C. § 1344. The Corps adopted regulations, known as the "public interest" factors, to implement its permitting authority. 33

C.F.R. § 320. "Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments. The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process." *Id.* § 320.4(a)(1). The Corps must consider a broad range of potential relevant impacts as part of its public interest review, including "conservation, economics, aesthetics, general environmental concerns, . . . fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, . . . water quality, energy needs, safety, . . . and, in general, the needs and welfare of the people." *Id.*

31.     In addition, the Environmental Protection Agency ("EPA") has promulgated regulations, known as the "404(b)(1) Guidelines," for Section 404 permits. 33 U.S.C. § 1344(b)(1); 33 C.F.R. § 320.2(f). A permit must be denied if it is contrary to the public interest or does not comport with the Section 404(b)(1) Guidelines. 33 C.F.R. §§ 320.4, 323.6; 40 C.F.R. §§ 230.10, 230.12.

32.     To ensure that these mandatory CWA requirements are satisfied, the Corps must fully evaluate the direct, secondary, and cumulative impacts of the proposed activity, including impacts to aesthetics, recreation, and fish and wildlife. *See, e.g.*, 33 C.F.R. §§ 320.4(a)(1), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§ 230.11(a)-(h), 230.20-23 (aquatic ecosystem), 230.31 (fish and wildlife), 230.51 (recreational and commercial fisheries), 230.52 (water-related recreation), 230.53 (aesthetics). The Corps must also set forth its findings in writing on the short-

term and long-term effects of the discharge of dredge or fill activities, as well as compliance or non-compliance with the restrictions on discharge. 40 C.F.R. §§ 230.11, 230.12(b).

33.     EPA's 404(b)(1) Guidelines prohibit the Corps from authorizing an application for dredge and fill activities if there is a practicable alternative which would have less adverse impacts on the aquatic ecosystem. *See* 40 C.F.R. §§ 230.10(a), 230.12(a)(3)(i). In analyzing the relative impacts between the proposed action and alternatives to determine which option constitutes the least damaging action, the Corps must examine impacts to "[w]ildlife associated with aquatic ecosystems [such as] transient mammals, birds, reptiles, and amphibians," as well as the potential "loss or change of breeding and nesting areas, escape cover, travel corridors, and preferred food sources for resident and transient wildlife species associated with the aquatic ecosystem." *Id.* § 230.32(a), (b). Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). "Fundamental to [404(b)(1)] Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c).

34.     Whereas a CWA permit is required to discharge dredge or fill material, to maintain a structure in navigable waters the Corps must issue a permit under Section 10 of the Rivers and Harbors Act ("RHA"). *See* 33 U.S.C. § 403. The Corps often issues a single permit authorizing a project under both the Clean Water Act and the Rivers and Harbors Act.

C.     **The Administrative Procedure Act**

35.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

A.     **Background**

36.     On February 7, 2011, DOE, in conjunction with the Department of Interior ("DOI"), released the National Offshore Wind Strategy ("2011 Strategy"), outlining actions those agencies would pursue "to promote and accelerate responsible commercial offshore wind development in the U.S. in both federal and state waters." A critical component of the 2011 Strategy is the Offshore Wind Innovation and Demonstration Initiative, which includes a mechanism for funding "Advanced Technology Demonstrations." According to DOE, the primary goal of Advanced Technology Demonstrations is "to support the installation of offshore wind turbines in U.S. waters in the most rapid and responsible manner possible." In 2016, DOE and DOI revised the National Offshore Wind Strategy ("2016 Strategy") to include three additional objectives: (1) "Reducing the costs and technical risks associated with domestic offshore wind development"; (2) "Supporting stewardship of U.S. waters by providing

regulatory certainty and understanding and mitigating environmental risks of offshore wind development"; and (3) "Increasing understanding of the benefits and costs of offshore wind energy." The 2016 Strategy once again emphasized the importance of Advanced Technology Demonstrations in gauging the impact of domestic offshore wind energy development.

37.     In May 2016, DOE awarded $40 million to the Lake Erie Energy Development Corporation ("LEEDCo") to construct the Icebreaker Project in Lake Erie. The funding was to be allocated in three phases: (1) an initial phase to assist with preliminary construction planning and related activities; (2) a second phase to assist with permitting and design refinement; and (3) a final phase for materials procurement and project installation. DOE has told the Plaintiffs that the Final EA and FONSI encompass all three phases, meaning the agency does not intend to conduct any further NEPA review for the Icebreaker Project.

38.     As proposed, the Icebreaker Project will be located 8-10 miles off the shore of Cleveland, Ohio in Lake Erie. It will initially consist of six 3.5-megawatt ("MW") wind turbines, 12 miles of collection cables buried beneath the lakebed, and a new substation constructed onshore. Each of the six turbines will be approximately 479 feet tall with a total rotor diameter of 413.41 feet, yielding a total rotor-swept zone of roughly 134,224.2 square feet at each turbine (805,345.2 square feet, or 18.48 acres, across all six turbines). At their lowest point, the turbine blades will be roughly 65 feet above the surface of Lake Erie. The Project is estimated to generate approximately 21 MW of electricity annually. Additionally, 150 feet of overhead transmission lines will be constructed to connect the new and existing substations. Power generated by the Project will be sold to Cleveland Public Power and into the PJM1 Interconnection wholesale market.

39.     The proposed location of the Icebreaker Project would place it directly in the heart of the Lake Erie Central Basin Important Bird Area, a designated Global Important Bird Area. The Project will also be located adjacent to the Cleveland Lakefront Important Bird Area and the Lake Erie Western Basin Important Bird Area. Important Bird Areas are designated by BirdLife International, a global coalition of conservation organizations focused on protecting birds and their habitats. They are defined as "significant for the long-term viability of naturally occurring bird populations" and are designated "through the application of quantitative ornithological criteria, grounded in up-to-date knowledge of the sizes and trends of bird populations," which ensures that the sites "have true significance for the international conservation of bird populations." The criteria applied in designating an Important Bird Area include: (1) the regular presence of a significant numbers of a globally threatened species; (2) the presence of a significant component of a species whose breeding distributions define an Endemic Bird Area or Secondary Area;[1] (3) the presence of a significant component of a group of species whose distributions are largely or wholly confined to one biome; and (4) the presence of congregations of ≥1% of the global population of one or more species on a regular or predictable basis. Both the Lake Erie Central Basin and Cleveland Lakefront Important Bird Areas were designated due to the significant concentrations of several different waterfowl species, as well as the importance of the region to migrating landbirds.

---

[1] According to BirdLife International, Endemic Bird Areas ("EBAs") are defined as:

> [P]laces where two or more species of restricted range, i.e. with world distributions of less than 50,000 km2, occur together. More than 70% of such species are also globally threatened. . . . A Secondary Area (SA) supports one or more restricted-range species, but does not qualify as an EBA because less than two species are entirely confined to it.

*Data Zone*, BirdLife Int'l, http://datazone.birdlife.org/site/ibacritglob (last visited Dec. 9, 2019).

40.     Recent efforts by the Ohio Department of Natural Resources ("ODNR"), FWS—
including by conducting aerial surveys—and reports from commercial fishing operations
documenting bird use of and presence in the Lake Erie Central Basin Important Bird Area have
revealed the astounding quantity and diversity of birds using the area. Indeed, counts of Red-
breasted mergansers have shown that a significant quantity of that species' global population—
approximately one-quarter of a million individuals—may all be present in the area at a given
time. Substantial concentrations of other waterfowl have also been recorded in the area,
including Common Goldeneye (>10,000 individuals), Canvasback (~9,000 individuals),
American Black Duck (>4,000 individuals), and Bufflehead (~6,800 individuals). Furthermore,
ornithologists are now beginning to recognize the importance of the area to northern gulls,
including Glaucous, Iceland, Greater Black-backed, Lesser Black-backed, and Little Gulls,
which use the Central Basin as an overwintering destination. Finally, ornithologists have long
recognized Lake Erie as a vital migration corridor for a multitude of species, including songbirds
and shorebirds, as studies have consistently recorded millions of individuals crossing through the
region twice a year during spring and fall migrations. The large quantities of these migrating
species passing through Lake Erie in turn attract raptors that target migrants as prey.

41.     The Lake Erie Central Basin Important Bird Area is an ecologically critical area
for bats as well as birds. Several different species of bats, including some that are listed or are
being considered for protection under the ESA, are also known to use the area for migration and
as hunting grounds. These bat species are attracted to the large swarms of insects that congregate
above the open waters of Lake Erie. Due to the uncontrolled spread of white-nose syndrome
("WNS"), a fatal fungal disease that has killed millions of bats in the United States, certain bat
populations are nearing the brink of collapse. The impact of WNS on bat populations is

compounded by the precipitous rise of land-based wind energy projects in the Midwest, which are responsible for the deaths of hundreds of thousands of individuals per year.

42.     Due in large part to the lack of reliable data regarding the impacts of wind energy projects on freshwater ecosystems, coupled with those projects' potential to adversely impact numerous sensitive natural resources, the Canadian province of Ontario has declared a moratorium on the construction of offshore wind energy projects on Lake Erie.

**B.      DOE's NEPA Process**

**a.      The Scoping Phase**

43.     On September 23, 2016, DOE published its scoping notice announcing its intent to prepare an EA for the Icebreaker Project, and requesting comments on the scope of the agency's environmental review. *See* 81 Fed. Reg. 65,634, 65,634 (Sept. 23, 2016) ("Scoping Notice").

44.      In response, DOE received 95 public comments, including three from federal agencies. Both FWS and the EPA pointed out serious deficiencies in DOE's Scoping Notice, and FWS objected to DOE's use of an EA to evaluate the precedent-setting Project, rather than an EIS. The third agency, the National Oceanic and Atmospheric Administration ("NOAA"), also noted the need for a rigorous examination of environmental impacts before allowing offshore wind energy projects to proceed in the Great Lakes.

45.     FWS's Scoping Comments, submitted on October 21, 2016, reminded DOE of its involvement in several previous discussions with DOE and LEEDCo regarding evaluations of the Project's potential impacts on wildlife in the Lake Erie region. In light of those discussions, FWS expressed serious concerns over both the lack of reliable data regarding wildlife impacts,

17

including birds and bats, and DOE's intent to examine the Project through an EA rather than a more comprehensive EIS.

46.     FWS concluded that LEEDCo's limited efforts to conduct pre-construction wildlife studies—including acoustic and radar monitoring to detect bat and bird use of the area— were insufficient to determine the actual impacts of the Project on wildlife. In particular, FWS explained that "due to radar malfunctions, the site where the radar was located, the time when the radar was operational, and other factors, the data obtained [from the Tetra Tech study] *was not sufficient to inform risk*." FWS Scoping Comments at 3 (emphasis added). Moreover, FWS observed that both "the radar and acoustic studies did not include the currently proposed project area." *Id.* at 2. In the absence of site-specific data, FWS reiterated that the Project's impacts on wildlife in the Project area were difficult to ascertain and recommended that further studies be conducted before DOE reached a conclusion regarding the significance of the Project's impacts. FWS stressed that "[b]ecause of the unknown consequences of developing offshore wind energy in the Great Lakes and the precedent-setting nature of the project, the pre- and post-construction evaluations of potential impacts on wildlife necessarily must meet a standard of rigor greater than wind projects on land." *Id.*

47.     FWS also strongly disagreed with DOE's decision to evaluate the Project through an EA and recommended that "DOE conduct an EIS to document the significance of the proposed project on fish and wildlife resources." *Id.* at 8. FWS highlighted the Project's implication of three separate "significance" factors, as identified by CEQ's regulations, 40 C.F.R. § 1508.27(b).

48.     First, FWS said that its prior experience in permitting wind energy projects showed that the Icebreaker Project would be "highly controversial." FWS Scoping Comments at

7 (quoting 40 C.F.R. § 1508.27(b)(4)). FWS noted that a prior land-based wind project in

northern Ohio, which involved only a single turbine, had garnered vehement opposition from

stakeholders in the region, including from the Plaintiffs in this lawsuit. Moreover, FWS stressed

that the underexamined impacts and lack of reliable data regarding bird and bat use of the Project

area would likely amplify opposition from members of the public concerned with the

implications of the landmark Icebreaker Project.

49.     Second, FWS stressed that the Icebreaker Project involves impacts that "are

highly uncertain or involve unique or unknown risks." FWS Scoping Comments at 8 (quoting 40

C.F.R. § 1508.27(b)(5)). FWS—the agency with specialized expertise regarding wildlife and

impacts associated with wind turbines—reiterated that the Project "presents unique risks to

migratory birds including the bald eagle due to the proximity of the project area to significant

migratory bird and bat habitat and concentration areas, specifically the offshore waters of Lake

Erie." *Id.* In light of the unique nature of the Project, FWS highlighted the ineffectiveness of

existing post-construction mortality monitoring methods, which would be critical to informing

future offshore wind projects constructed in the United States. Thus, FWS recommended that

"innovative new methods" would need to be designed and implemented; however, the

effectiveness of those methods would themselves be "unknown." *Id.* Accordingly, an EIS would

be the most appropriate mechanism to fully evaluate the potential impacts of the Project and

mitigation measures.

50.     And third, FWS emphasized that the Icebreaker Project is likely to "establish a

precedent for future actions with significant effects or represents a decision in principle about a

future consideration." FWS Scoping Comments at 8 (quoting 40 C.F.R. § 1508.27(b)(6)). As

noted by FWS, the Project will be the "first installation of offshore wind anywhere in the Great

Lakes, and likely only the second offshore wind facility in the western hemisphere." FWS

Scoping Comments at 8. Moreover, FWS observed that LEEDCo's "ultimate intent is to expand

from an initial 20-30 megawatt demonstration project to a 1,000 MW build out" in the near

future. *Id.* Thus, in the expert view of FWS, the Icebreaker Project clearly implicated the

precedent-setting significance factor under CEQ's regulations. Accordingly, FWS stressed that

"an EA is inadequate to fully address the potentially significant, precedent setting aspects of this

project." *Id.*

51.    EPA's Scoping Comments, submitted on October 21, 2016, also criticized the

purported scope of DOE's alternatives analysis. EPA noted "that the proposed location for the

Project Icebreaker pilot is the result of multiple earlier studies that considered a variety of

environmental, geological, technical, and economic factors in site selection and project

feasibility." EPA Scoping Comments at 2. Yet, none of those prior alternatives had been

adequately discussed, analyzed, or compared by DOE. Accordingly, EPA recommended that

"the EA summarize the range of alternative sites considered in the project development and the

rationale selection of this proposed site and elimination of other proposed sites." *Id.*

52.    NOAA's Scoping Comments, submitted on October 24, 2016, included a report

prepared by over 40 experts "on the potential cumulative effects of offshore wind farms on the

larger ecosystem in the Great Lakes." NOAA Scoping Comments at 2. The report stressed that

"the cumulative effects of [offshore wind developments] are not well understood, yet are crucial

to minimize potential impacts on Great Lakes fish and other aquatic resources, as well as other

ecosystem components such as birds and bats, from future [offshore wind] developments."

NOAA Scoping Comments, Report at 16. Accordingly, the NOAA Report emphasized the need

for careful environmental studies based on sound methodologies prior to implementing offshore wind energy projects.

**b.      The Draft Environmental Assessment**

53.     Despite concerns expressed by FWS and others stressing the need for a rigorous EIS to fully examine the Project's impacts, DOE published its Draft EA for the Icebreaker Project in August 2017.  It said that the purpose and need for the Project "is to verify innovative designs and technology developments and validate full performance and cost under real operating and market conditions." Draft EA at 1-3. The Draft EA further noted that the Project would "fulfill DOE's goals of installing innovative offshore wind systems in U.S. waters in the most rapid and responsible manner possible and expedite the development and deployment of innovative offshore wind energy systems with a credible potential for lowering the [levelized cost of energy]." *Id.*

54.     Particularly relevant here, the Draft EA concluded that "[t]he proposed wind turbines are not likely to generate population-level effects for any species," which, according to DOE, means that "potential impacts to birds and bats would be considered minor." Draft EA at 3-50. However, as noted by FWS in its Scoping Comments, DOE's conclusion relied on flawed data projections and faulty assumptions regarding bat and avian density within the Project area. Indeed, DOE noted that its impacts conclusion rested "primarily on the low use of offshore environments within the central Lake Erie basin by birds and bats," *id.*, as reported by LEEDCo's avian and bat density studies, the methodologies of which FWS strongly criticized and dismissed as fatally flawed.

55.     Notwithstanding EPA's recommendation that DOE examine a broader range of alternatives, the Draft EA analyzed only two: "the potential environmental impacts of the

Proposed Action and the No-Action Alternative." Draft EA at 1-1. Although the Draft EA offered a cursory explanation for LEEDCo's dismissal of alternative Project sites, DOE did not itself provide a meaningful *comparison* of the environmental impacts of those alternatives, nor did DOE meaningfully consider whether alternate locations would fulfill the federal purpose and need that underlie the Project. *See* Draft EA at 2-22. Indeed, the portion of the Draft EA discussing the proposed turbine layout specifically noted that "[e]nvironmental and cost factors were not analyzed." Draft EA at 2-27. Moreover, DOE ultimately failed to include even this cursory discussion of alternative locations in the Final EA and, for these reasons, cannot satisfy DOE's obligation under NEPA to examine all reasonable alternatives.

56.    With respect to cumulative impacts, the Draft EA summarily concluded that because "no other offshore projects were identified and offshore activities from the Project would have negligible impacts to birds and bats, cumulative impacts to birds and bats would be expected to be negligible." Draft EA at 4-2. DOE reached this conclusion despite the express categorization of the Icebreaker Project as a "demonstration project" that is meant to catalyze and direct further expansion of commercial wind energy development in the Great Lakes region, including the potential construction of over 1,000 additional wind turbines on Lake Erie alone.

57.    In addition to DOE's cursory impacts and alternatives analyses, the Draft EA also purported to set forth the Corps' examination under the CWA of the various public interest review factors listed in 33 C.F.R. § 320.4(a)(1) and implicated by the Project. As to nearly every factor listed, however, the Draft EA simply referred the reader to the corresponding analysis conducted by DOE without any additional independent analysis by the Corps—a cooperating agency involved in the preparation of the Draft and Final EAs.

58.     In response to the Draft EA, DOE received comments voicing overwhelming opposition to the Icebreaker Project and/or DOE's analysis of the Project's impacts, including from Plaintiffs, other conservation organizations, FWS, EPA, ODNR, and other state agencies.

59.     FWS's comments, submitted on October 4, 2017, were deeply critical of the Draft EA's evaluation of the Project's environmental impacts. FWS repeated many of the objections it raised in its Scoping Comments. In addition to concerns with DOE's overall NEPA process, FWS addressed three principal deficiencies in the Draft that, when taken either individually or collectively, downplayed and artificially minimized the Project's impacts: (1) the Draft EA's mischaracterization of "bird and bat use of the project area"; (2) the suppressed evaluation of "collision mortality of birds and bats from the operating project"; and (3) the lack of any monitoring mechanisms necessary to "inform items 1 and 2." FWS Draft EA Comments at 2.

60.     With respect to the Draft EA's characterization of bird and bat use of the Project area, FWS noted that "the conclusions reached in the Draft EA regarding potential impacts to birds and bats are based on available data collected primarily *outside* of the project area," meaning that the conclusions reached in the Draft EA "may or may not be accurate." *Id.* at 2–3 (emphasis added). Likewise, FWS again criticized the Draft EA's conclusion that migratory birds "tend to concentrate along coastlines and avoid flying over large water bodies, such as Lake Erie, if possible." *Id.* at 3 (quoting Draft EA at 3-32). According to FWS, DOE's conclusion on this point was "misleading," as the studies relied upon by DOE in fact show that "large numbers of migrants *do* fly over water bodies," including Lake Erie and the Project area. *Id.* (emphasis added).

61.     FWS also criticized the Draft EA's extensive reliance on NEXRAD radar data to estimate the quantity of birds and bats using the Project area. As noted by FWS, NEXRAD

"primarily provides data on migrating birds and bats located *above* the rotor-swept zone";

however, "[b]ird and bat densities at higher altitudes do not always correlate with densities at

lower altitudes, and this may especially be the case in a different environment such as offshore."

*Id.* at 4 (emphasis added). Thus, FWS observed that "it is impossible to use this data to determine

if birds and bats are flying within the rotor-swept zone or above it." *Id.* at 4.

62.     In fact, FWS noted that its recent radar studies directly refute DOE's NEXRAD

data and DOE's conclusion that bird and bat use of the Project area is low. FWS's site-specific

data revealed that "large numbers of bats and birds migrat[e] across the lake during fall, often

within or near the rotorswept zone." *Id.* FWS specifically included those data in its comments to

DOE so that DOE could engage in an informed NEPA process, which DOE failed to do.

63.     FWS also criticized DOE's reliance on NEXRAD data to estimate songbird

mortality. Disputing DOE's conclusion that impacts to songbirds would be minimal due to the

fact that "less than half" of these birds migrate over Lake Erie, FWS stressed that "less than half"

of songbirds is still a significant number of individuals as "there are still likely to be *millions* of

individual birds crossing Lake Erie during spring and fall migration each year." *Id.* at 6

(emphasis added). FWS pointed out that the Draft EA's conclusion—that songbird mortality

would be "low"—was based on the erroneous assumption that migration behaviors and

conditions are the same over water as they are over land. *Id.* According to FWS, the staggering

quantity of songbirds crossing Lake Erie—potentially within the rotor-swept zone of the

Project—combined with the fact that these birds "comprise the majority of mortality at wind

power projects," exemplifies the need for careful study of the Project's impacts on this

particularly vulnerable category of birds. *Id.* However, the present lack of reliable, site-specific

data on songbird migration precludes any estimate on the number of songbirds "that might be at

risk of collision with the turbines." *Id.* For these reasons, FWS renewed its calls for rigorous, site-specific studies, noting that "implementation of the study within the project area has not occurred to date." *Id.*

64.     According to FWS, the Draft EA also underreported or artificially minimized the Project's mortality rate by overlooking certain bird and bat behaviors exhibited in the offshore environment. In particular, FWS noted the Draft EA's failure "to account for the observations that birds will sometimes seek man-made structures to land on while migrating over large bodies of open water such as oil platforms or even freighters." FWS Draft EA Comments at 5–6. Avian attraction to these man-made structures, including the Icebreaker Project, "could increase mortality rates." *Id.* at 6. Although FWS noted that "[i]t is unclear if bats are attracted to turbines," it said that "the potential for attraction is of concern, particularly in an offshore setting where attraction may be intensified if turbines are perceived by bats as the only available roost." *Id.* at 7.

65.     Because the Icebreaker Project is intended to serve as a demonstration project to guide further development of offshore wind energy in the Great Lakes region and beyond, FWS also highlighted the need for the development and implementation of comprehensive post-construction monitoring plans to study the actual impacts of the Project on the area's vulnerable wildlife populations. According to FWS, "[d]eveloping and validating methods for generating robust mortality estimates for bats and birds, and testing methods to collect and identify carcasses at offshore wind projects is critically important if this demonstration project is to inform future offshore wind development in the Great Lakes and elsewhere." FWS Draft EA Comments at 8. If these "impacts are not accurately measured for this precedent-setting project, risk levels of larger future projects may be substantially underestimated." *Id.* at 3. For these

reasons, FWS recommended that the Draft EA be revised to include a robust fatality monitoring

plan, and that DOE's funding of the Project be conditioned on the implementation of those

monitoring mechanisms. *Id.* at 8.

66.    FWS also renewed its objection to DOE's cursory evaluation of the Project's

environmental impacts through an EA, as opposed to an EIS. Specifically, FWS once again

stated that an EIS was required because: (1) the "possible effects on the human environment are

uncertain"; (2) "the project is precedent setting since it is the first proposed off-shore wind

facility in freshwater and that it is intended as a demonstration project"—with the clear potential

for expansion; and (3) given the lack of reliable data collected by LEEDCo and its engineers,

"there is uncertainty regarding the potential impacts of this project." FWS Draft EA Comments

at 8. FWS also noted that the lack of reliable data from LEEDCo was particularly troubling in

light of DOE's failure to require any pre- or post-construction studies. FWS observed that

without those studies, "there is likely to be little more certainty of biological impacts after the

project is constructed and operating than is currently available." *Id.* For these reasons, FWS

stressed that "an EA is the incorrect NEPA document for this project." *Id.* at 9.

67.    FWS also noted two additional serious deficiencies in the Draft EA that rendered

it insufficient to satisfy DOE's obligations under NEPA. *See id.* at 9–10 (summarizing measures

necessary to make the EA "reasonably sufficient"). First, the Draft EA failed to meaningfully

discuss any alternatives other than the proposed action and the no-action alternative, and

therefore did not "fully analyze any additional alternatives as called for in 40 C.F.R. § 1502.14."

*Id.* at 9. FWS urged consideration of additional alternatives that would allow DOE and the public

to understand the full extent of the Icebreaker Project's impacts on wildlife under FWS's

jurisdiction. Second, FWS criticized the Draft EA's failure to meaningfully discuss the Project's

cumulative impacts, particularly in light of the Project's stated aim of facilitating commercial

wind energy development in the Great Lakes. The Draft EA says that DOE funding of the

Icebreaker Project is intended to pave the way for the private sector to "creat[e] a robust U.S.

Offshore Wind Energy Industry." Draft EA at 1-2. Therefore, as FWS noted, "one of the

cumulative effects of funding the project could be the accelerated development of utility-scale

wind power in the offshore waters of Lake Erie." FWS Draft EA Comments at 9. Yet, "this

reasonable outcome" is neither analyzed nor anticipated by the cumulative impacts section of the

Draft EA. *Id.* To "eliminate uncertainties and mitigate risk" associated with the Project, FWS

therefore recommended that DOE's NEPA analysis include a meaningful discussion "of the

potential cumulative impacts of facilitating accelerated development of utility-scale wind power

in Lake Erie." *Id.* at 10–11.

68.     On October 5, 2017, Plaintiffs jointly submitted extensive comments on the Draft

EA, echoing many of the concerns raised by FWS. In particular, Plaintiffs urged that an EA was

an inappropriate vehicle to examine the Project's impacts, and requested that DOE prepare an

EIS for the Project.

69.     With respect to DOE's purported consideration of alternatives, Plaintiffs noted

that the Draft EA's analysis of only two alternatives (i.e., to fund the Project or not) was

insufficient for a project of this magnitude, particularly where the Project is expressly designed

to facilitate future commercial offshore wind energy development both in the Great Lakes and

elsewhere. Accordingly, Plaintiffs proposed several alternatives that would both demonstrate the

feasibility of offshore wind energy projects while minimizing the adverse environmental

impacts, including the use of bladeless turbine designs that would substantially minimize the

impacts on birds and bats.

70.     In addition, because the Project is both expressly intended to inform future wind energy development and serve as the initial phase of a much larger build-out, Plaintiffs stressed the need for careful consideration of cumulative impacts through an EIS.

71.     Plaintiffs also pointed out serious procedural and substantive deficiencies in the Draft EA and its analyses, including many that were also raised by FWS. For example, Plaintiffs highlighted numerous flaws in the Draft EA's conclusions regarding bird and bat densities within the Project area, and disputed DOE's characterization of the scientific literature used to support those conclusions. In particular, Plaintiffs identified several serious methodological concerns underlying the NEXRAD data DOE relied upon to estimate baseline population numbers in and migratory flights through the area of the Project. As noted in Plaintiffs' comments, "NEXRAD is in not capable of estimating numbers or risk over Lake Erie," a fact that was confirmed by Dr. Diehl, the author of the paper relied upon extensively in the Draft EA. Likewise, Plaintiffs observed that many of the studies relied upon by DOE, including the most recent study by LEEDCo's hired consultant, did not actually examine the Project area and instead made assumptions regarding avian density by erroneously extrapolating estimates from studies conducted near the Project area. For these reasons, Plaintiffs urged DOE to conduct additional site-specific monitoring to accurately evaluate the density of birds and bats within the Project area.

72.     Plaintiffs also noted that many of the same scientific errors found in DOE's assessment of bird and bat usage of the Project area—i.e., unsupported assumptions and flawed data-collection techniques—necessarily yielded faulty mortality estimates in the Draft EA.

73.     EPA's comments on DOE's Draft EA again criticized DOE's consideration of alternatives and its analysis of impacts on the biological resources of Lake Erie. To "produce a

*defensible* NEPA record," EPA recommended that DOE's final NEPA document describe the alternative projects considered by DOE and "the process of selecting alternatives for analysis," including the criteria that ultimately led to DOE's selection of the Project. EPA Draft EA Comments at 2 (emphasis added). According to EPA, this examination of alternatives was particularly important in light of the Project's designation as a "demonstration project." *Id.*

74.    EPA also questioned the sufficiency of DOE's examination of impacts attributable to the Icebreaker Project. Specifically, EPA questioned whether DOE's conclusion— that the Project's impacts to birds, bats, and listed species would be "minor"—was based on an accurate understanding of the environmental baseline. *Id.* at 3. Likewise, EPA questioned whether the Draft EA provided a sufficient basis for its impacts analysis before ultimately concluding that any impacts resulting from the Project would be minimal. In light of these outstanding questions, EPA "strongly encourage[d] DOE and LEEDCo to incorporate all recommendations from relevant Federal and state agencies" into DOE's final NEPA analysis. According to EPA, "doing so would incorporate the expertise of these agencies and should reduce impacts" to wildlife and other affected resources. *Id.* at 4

75.    On October 11, 2017, ODNR submitted comments mirroring those submitted by FWS regarding the lack of information regarding impacts to birds and bats. Specifically, ODNR emphasized that "[v]ery little is information about birds and bats at the project site has been collected to-date and conclusions drawn [existing] data may be misleading." ODNR Draft EA Comments at 3. For this reason, ODNR requested that robust data be collected "to support site-specific conditions in order to evaluate the risk of the project to bird and bat species." *Id.*

c.     **The Final Environmental Assessment**

76.     In September 2018, DOE published its Final EA and FONSI for the Icebreaker

Project. It contained no substantive revisions from the content contained in the Draft EA.

77.     Likewise, the Final EA's CWA Section 404 analysis of the public interest factors

remained substantively unchanged. With regard to almost every factor listed, the Corps' public

interest review relied entirely on the analysis conducted by DOE without any further discussion

of additional alternatives or cumulative impacts associated with permitting the Icebreaker

Project.

78.     Citing the small scale of the Icebreaker Project to support its decision not to

prepare an EIS, DOE declared that "[t]he potential impacts to the human environment are fully

analyzed and supported by previous projects, studies and publications," and that "[t]here is a low

probability of highly uncertain effects or unique or unknown risks resulting from the Proposed

Project." FONSI at 4. DOE reached this conclusion without meaningfully evaluating the bat and

avian survey data provided by FWS from the *very location* where the Project would be

constructed. To the contrary, the Final EA makes only passing reference to FWS's site-specific

data by noting that it will merely "continue to characterize potential bird and bat resources in the

area and to refine" some unspecified "pre- and post-construction monitoring for the

demonstration project." Final EA at 3-32.

79.     The FONSI likewise dismissed the ecological value of the Central Lake Erie

Basin Important Bird Area. It concluded that the "small size" of the Project would yield "both

short- and long-term impacts but those impacts would be minor," and that Project would not

threaten "population-level impacts to any species of birds . . . ." FONSI at 3. DOE did not

examine the impacts of the development of wind power on the area that the Project is expressly intended to catalyze.

80.     Moreover, neither the Final EA nor the FONSI attempts to explain why population-level impacts are a prerequisite to triggering the significance requirement under 40 C.F.R. § 1508.27(b)(3) (requiring consideration of "[u]nique characteristics of the geographic area such as . . . *ecologically critical areas*" (emphasis added)). Neither document discusses the impact that the Icebreaker Project, regardless of size or impact level, will have on the conservation value of the Central Lake Erie basin as an Important Bird Area.

81.     DOE also dismissed comments requesting an EIS based on "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Although the agency acknowledged that several commenters had expressed concern over EA's lack of site-specific data, DOE concluded without explanation that "those concerns did not rise to a substantial dispute." FONSI at 4. At no point did DOE incorporate the site-specific bat and avian survey data offered by FWS, nor did DOE meaningfully address comments from Plaintiffs, FWS, and ODNR criticizing the scientific validity of the studies DOE relied upon to reach its conclusions regarding the Project's impacts. Instead, the FONSI simply declares that "[*t*]*here is no known credible scientific controversy over the impacts of the Proposed Project*." *Id.* (emphasis added). DOE did not offer any meaningful rebuttal to the critiques of its data or methods. Although DOE reported that it had come to "a general understanding" with FWS "that an EA is the appropriate level of NEPA review for the" Project, that agreement does not appear in the record and does not explain how FWS's serious concerns were actually addressed by DOE.

82. As to comments from federal and state agencies, Plaintiffs, and others requesting an EIS on the basis of the precedent-setting nature of the Project, the FONSI states that "[i]mplementation of the Proposed Project *does not establish precedent for future actions* or represent a decision in principle about a future consideration." FONSI at 4 (emphasis added). As FWS and Plaintiffs have observed, LEEDCo stated that its "ultimate intent is [to] expand [the Project] from a 20-30 megawatt demonstration project to a 1,000 MW build-out" in the near future. FWS Scoping Comments at 8. Yet, DOE failed to explain how the Icebreaker Project—which has been heralded as "demonstration project" with the express aim of "creating a robust U.S. Offshore Wind Energy Industry," Draft EA at 1-2, and will be the first offshore wind project in the Great Lakes, the second ever constructed in freshwater anywhere in the world, and only the second offshore wind project in the United States—does not "establish precedent for future actions or represent a decision in principle about a future consideration." FONSI at 4.

83. Despite objections from Plaintiffs, FWS, and EPA that the range of alternatives considered in the Draft EA was unduly narrow, DOE declined to expand the range of alternatives beyond the two considered in the Draft EA—i.e., either funding the Project as proposed, or not funding the Project (the No-Action Alternative). Under the No-Action Alternative, DOE assumed that the Project would not be constructed. By limiting its evaluation of alternatives to either funding the Project as proposed or not, DOE failed to give meaningful consideration to alternatives that would have fewer adverse impacts, including locating the Project in less environmentally sensitive areas, requiring the use of bladeless turbines, or at least developing rigorous post-construction monitoring and adaptive management measures.

84. In response to comments critical of its alternatives analysis in the Final EA, DOE noted that NEPA requires agencies to "study, develop, and describe appropriate alternatives to

recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E). DOE then asserted—without further explanation—that it was not required to consider any additional alternatives because "[t]he Proposed Action does not involve unresolved conflicts concerning alternative uses of available resources." Final EA, App'x A-2, Summary Table of Responses to Draft EA Comments (DOE Response Matrix) at 3. Yet, in making this assertion (which it failed to supply as a rationale for its truncated alternatives analysis in the Draft EA), DOE failed to acknowledge not only that the Project was competitively selected for an award—meaning that, as a factual matter, at least two other alternative projects were considered, *see* Final EA at 1-1-2—but also that commenters comprised of resource managers, scientists, and members of the public vigorously disputed DOE's decisions regarding the Project and allocation of the use of wind and biological resources on Lake Erie. Indeed, as noted above, many commenters, including FWS and ODNR, stressed that an absence of reliable data warrants careful study of the Project's impacts to ensure those resources are not depleted beyond rehabilitation, while a minority of commenters expressed support for the development of wind energy in the Great Lakes. *See* DOE Response Matrix at 12. DOE failed to explain how this dispute over the present and future uses of resources in the Great Lakes region did not qualify as an "unresolved conflict" over the use of various natural resources such that the public would be greatly benefitted by a robust alternatives analysis that sharply defines the pros and cons of all available options.

85.     DOE relied on its unexplained assertion that the Project did not involve "unresolved conflicts" to summarily dismiss from detailed consideration reasonable alternatives that were offered by Plaintiffs and FWS. Indeed, Plaintiffs' comments identified a number of feasible alternatives that included innovative turbine designs specifically developed to reduce the

impacts on birds and bats. FWS, too, proposed alternatives that the agency—in its expert wildlife capacity—considered relevant for DOE to consider in its NEPA analysis, including the development of experimental pre- and post-construction monitoring mechanisms to better understand the Icebreaker Project's impacts and to help guide any future expansion of wind power in the Great Lakes. Despite the fact that the suggested alternatives would have achieved the Project's express purpose—i.e., "to verify innovative designs and technology developments and validate full performance cost under real operating market conditions"—DOE dismissed each of the suggested alternatives from detailed consideration.

86.     Notwithstanding multiple requests from Plaintiffs and FWS that DOE fully examine the cumulative impacts of the very wind energy development that the Project is intended to catalyze, DOE's cursory cumulative impacts analysis in the Final EA remained unchanged. In responding to commenters, DOE stated that "[t]here are no identified reasonably foreseeable actions or proposed projects in Lake Erie of the Great Lakes region." DOE Response Matrix at 12. For that reason, the Final EA concluded that "the goal of LEEDCo and other wind energy supporters to further develop offshore wind in this region is speculative." Final EA at 4-1. According to DOE, "[i]n the absence of an actual proposal, there is not a reasonably foreseeable future action to evaluate as part of the cumulative impacts assessment." *Id.* In essence, DOE maintained that projects were not "reasonably foreseeable"—and as a result, a cumulative impact—unless and until a formal application for a specific wind energy project has been filed. DOE dismissed the potential for future wind development in Lake Erie as "speculative" even though the Icebreaker Project is explicitly intended to pave the way for future wind development both in the Great Lakes region and elsewhere in the United States, and that LEEDCo itself has expressed a desire to expand the Project from a 20 MW facility to a 1,000 MW facility in the

near future. As a result, DOE made no effort to examine—either generally or qualitatively—the impacts from the wind energy development that the Project is expressly intended to inform. Nor did DOE attempt to reasonably forecast the ultimate number of turbines that might be placed in the region's offshore ecosystem and the associated environmental impacts, despite the fact that methods and models exist *and have been used by DOE* to forecast wind development in environmental analyses for other projects.

### C.     The Corps' Section 404 Process

87.     On August 31, 2017, LEEDCo applied for a permit for the Project under Section 10 of the RHA and Section 404 of the CWA.

88.     In September 2018, prior to DOE's publication of its Final EA, the Corps released a "Fact Sheet" outlining the status of the Corps' review of the Project. In pertinent part, the "Fact Sheet" reported the Corps' proposed intent "to incorporate by reference elements of any final DOE EA into the Corps' environmental analysis decision document." The Corps' "Fact Sheet" further stated that the agency would be determining whether "the benefits of the" Project outweighed its "detriments."

89.     On March 13, 2019, the Corps issued a Section 10 RHA and Section 404 CWA combined permit to LEEDCo for the construction and operation of the Project ("CWA Permit").

90.     The Final EA contains "[a] summary of how each of the[] public interest review factors was considered in the EA." Final EA at 2-27. The Corps does not offer any analysis of the listed public interest factors. Rather, the Corps directs the public to the section of the Final EA that "describe[s]" the environmental impacts of the Project on the resources implicated by each factor. At no point did the Corps state whether the impacts on each public interest factor

weighed for or against granting the CWA Permit. In fact, *none* of the sections the Corps incorporated by reference even *mentions* the "public interest."

91.    At no point in the Final EA did the Corps analyze whether the Project is the least environmentally damaging practicable alternative, as required under the CWA. Nor has the Corps issued any public document examining alternatives to the Project.

92.    On information and belief, the Corps did not conduct any additional environmental analysis beyond that contained DOE's Final EA. Nor did the Corps ever independently determine whether "the benefits of the" Project outweighed its "detriments," or whether the Project constituted the least environmentally damaging practicable alternative. Instead, the Corps relied on DOE's Final EA as a substitute for its own independent evaluation of the public interest factors and feasible alternatives.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim 1 – Violations of NEPA and the APA

93.    All allegations set forth above in this Complaint are incorporated here by reference.

94.    This First Claim for Relief challenges DOE's violations of NEPA and its implementing regulations in funding the Project and preparing its Final EA and FONSI. Plaintiffs bring this claim under the judicial review provisions of the APA, 5 U.S.C. § 706. DOE violated NEPA and its regulations in multiple respects through funding the Project.

95.    By failing to prepare an EIS, despite the fact that the Project implicates several of NEPA's significance factors and will result in significant environmental impacts, DOE violated NEPA and its implementing regulations, and acted arbitrarily and capriciously.

96.     By failing to examine a reasonable range of alternatives, and by relying on an unexplained recitation of NEPA's statutory language to evade consideration of a reasonable range of alternatives to the Project, DOE violated NEPA and its implementing regulations, and acted arbitrarily and capriciously.

97.     By failing to adequately analyze alternatives that could minimize the Project's environmental impacts while simultaneously satisfying DOE's stated purpose and need, DOE violated NEPA and its implementing regulations, and acted arbitrarily and capriciously.

98.     By supplying a new rationale in its response to comments at the Final EA stage for its decision not to analyze any action alternatives other than the proposed action, DOE failed to provide the public with an opportunity to address the validity of that rationale and issued a final EA and decision that do not constitute the logical outgrowth of the analysis in the Draft EA, in violation of NEPA, its implementing regulations, and the APA.

99.     By arbitrarily rejecting or failing to meaningfully address highly relevant comments from expert sister agencies, Plaintiffs, and others—including data demonstrating that DOE's impacts analysis with respect to affected wildlife was fatally flawed—DOE failed to take a "hard look" at the substantial impacts of the Icebreaker Project, in violation of NEPA, its implementing regulations, and the APA.

100.     By arbitrarily ignoring and/or dismissing the reasonably foreseeable impacts of its decision to fund the Icebreaker Project, including impacts from the very expansion of wind energy in the Great Lakes that the Project is intended to catalyze (both through this Project's future expansion and the construction of additional projects), DOE failed to take a "hard look" at the indirect and cumulative impacts attributable to the Icebreaker Project, in violation of NEPA, its implementing regulations, and the APA.

## Claim 2 – Violations of the CWA and the APA

101.   All allegations set forth above in this Complaint are incorporated here by reference.

102.   This Second Claim for Relief challenges the Corps' violations of the CWA and its implementing regulations in permitting the Project's construction and operation. Plaintiffs bring this claim under the judicial review provisions of the APA, 5 U.S.C. § 706. Defendants violated the CWA and its regulations in multiple respects through issuance of the challenged Section 404 permit.

103.   By resting its purported evaluation of the public interest factors entirely on the Final EA's fatally flawed impacts analysis and attempting to rely on the Final EA as a substitute for an independent analysis of the public interest factors affected by the Project, the Corps violated the CWA and its implementing regulations. In addition, the Corps' failure to make any determination as to whether the Project is in the public interest before issuing the Section 404 Permit violated the CWA and is arbitrary and capricious.

104.   By failing to identify—let alone analyze—the relative benefits and impacts of feasible alternatives to the Project beyond the single action alternative examined in the Final EA (i.e., the proposed action), the Corps failed to examine and determine whether the Project was the least environmentally damaging practicable alternative, in violation of the CWA, its implementing regulations, and the APA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(1)   Declare that Defendants' decisions to fund and authorize construction and operation of the Icebreaker Project as described herein violates NEPA, the CWA, and the APA;

(2)     Set aside DOE's funding award to LEEDCo, the Final EA, the FONSI, and the

Corps' permit consistent with the requirements of NEPA, the CWA, and the APA;

(3)     Enjoin Defendants from funding and/or authorizing the Icebreaker Project and its

operation until DOE and the Corps have fully complied with their obligations under NEPA, the

CWA, and the APA;

(4)     Award Plaintiffs their reasonable attorneys' fees and costs; and

(5)     Grant Plaintiffs any other further relief that this Court may deem just and proper.

Respectfully submitted this 11th day of December, 2019.

> */s/Matthew R. Arnold*
> Matthew R. Arnold
> DC Bar No. 1618616
> Eubanks & Associates, LLC
> 1509 16th St. NW
> Washington, DC 20036
> 843-718-4513
> matt@eubankslegal.com
>
> */s/ Elizabeth L. Lewis*
> Elizabeth L. Lewis
> DC Bar No. 229702
> Eubanks & Associates, LLC
> 1509 16th St. NW
> Washington, DC 20036
> 202-556-1243
> lizzie@eubankslegal.com
>
> */s/William S. Eubanks, II*
> William S. Eubanks, II
> DC Bar No. 987036
> Eubanks & Associates, LLC
> 2601 S. Lemay Ave.
> Unit 7-240
> Fort Collins, CO 80525
> 970-703-6060
> bill@eubankslegal.com
>
> */s/ William F. Sheehan*
> William F. Sheehan

DC Bar No.  174714
Vice President and General Counsel
American Bird Conservancy
4301 Connecticut Avenue, NW
202-234-7181
wsheehan@abcbirds.org

*Counsel for Plaintiffs*