UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN BIRD CONSERVANCY et al.,

    *Plaintiffs*,

v.

JENNIFER GRANHOLM et al.,

    *Defendants*.

Civil Action No. 19-3694 (TJK)

## MEMORANDUM OPINION

In 2013, the Department of Energy selected a project proposal to receive a funding award for offshore wind energy demonstration projects. The project entails installing six wind turbines in Lake Erie a few miles north of Cleveland, Ohio. The agency began its review under the National Environmental Policy Act in May 2016, ultimately releasing a final Environmental Assessment but—consistent with its finding that the project would have no significant impact on the environment—not an Environmental Impact Statement. The company that proposed the project also sought and obtained a Clean Water Act Section 404 permit. Plaintiffs, two nonprofit organizations dedicated to the conservation of native bird populations and their habitats, say that the agency violated the National Environmental Policy Act by failing to prepare an impact statement and failing to take a hard look at reasonable alternatives and the cumulative impacts of its decision. They also argue that the Section 404 permit violates the Clean Water Act. The parties have cross-moved for summary judgment. For the following reasons, the Court will dismiss Plaintiffs' claims under the National Environmental Policy Act for lack of standing. On the Clean Water Act claim, it will deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion.

I.   **Background**

    A.  **Statutory Background**

        1.   **NEPA**

The National Environmental Policy Act ("NEPA") requires agencies to "consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1. It requires agencies to prepare an Environmental Impact Statement ("EIS") "whenever a proposed major federal action will significantly impact the quality of the human environment." *Sierra Club v. Peterson*, 717 F.2d 1409, 1412 (D.C. Cir. 1983). The EIS requirement "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). At the same time, it allows the public to obtain "the relevant information" and "play a role in both the decisionmaking process and the implementation of that decision." *Id.*

But not all projects implicating environmental concerns require an agency to prepare an EIS. To kickstart NEPA review, agencies first prepare an Environmental Assessment ("EA") that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement" and "[b]riefly discuss[es] the purpose and need for the proposed action, alternatives . . . , [and] the environmental impacts of the proposed actions and alternatives." 40 C.F.R. § 1501.5(c). If, based on the EA, the agency "finds that the proposed action will produce 'no significant impact' on the environment, then an EIS need not be prepared." *Sierra Club*, 717 F.2d at 1412–13 (quoting 40 C.F.R. § 1501.4(e) (2018)).[1] Instead, it must prepare a Finding of

---

[1] In September 2020, the Council on Environmental Quality published a new rule relocating and, in some cases, significantly revising NEPA's implementing guidelines. *See* 85 Fed. Reg. 43,304 (July 9, 2020). But Plaintiffs' claims arise under the 1978 regulations, as amended in 1986. *See* 43 Fed. Reg. 55,978 (Nov. 29, 1978); 51 Fed. Reg. 15,618 (Apr. 25, 1986). These regulations, codified at 40 C.F.R. § 1500 *et seq.* (2018), can be found here: https://perma.cc/45VP-ZYYC.

No Significant Impact ("FONSI"). 40 C.F.R. § 1501.4(e) (2018). In all, NEPA's procedures ensure that agencies "take a hard look at environmental consequences." *Methow Valley Citizens Council*, 490 U.S. at 350 (quotations omitted).

  **2.**  **Clean Water Act**

The Clean Water Act's ("CWA") objective "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the Act prohibits discharging pollutants into U.S. waters without a permit issued under Section 404. *See* 33 U.S.C. §§ 1311(a), 1344(a). The Act assigns the Army Corps of Engineers ("Corps") the responsibility to issue such permits. *Id.* § 1344(d). The Corps reviews permit applications under the Section 404(b)(1) Guidelines, codified at 40 C.F.R. part 230, and other implementing regulations at 33 C.F.R. parts 320–32. Before issuing a permit, the Corps must determine that "there is [no] practical alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 U.S.C. § 230.10(a). The Guidelines also bar the Corps from permitting "discharge of dredged or fill material . . . which will cause or contribute to significant degradation of the waters of the United States." *Id.* § 230.10(c). The Corps also conducts a "public interest review," evaluating the "probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1). It will grant a permit unless, based on various factors the regulations outline, doing so "would be contrary to the public interest." *Id.*

  **B.**  **Factual and Procedural Background**

To advance the 2005 Energy Policy Act's directive to "conduct programs of renewable energy research, development, demonstration, and commercial application," in 2012 the

3

Department of Energy ("DOE") created a funding opportunity for offshore wind energy demonstration projects. *See* 42 U.S.C. §§ 16231(a)(1), (2)(B)(ii). As part of its larger strategy to develop "a world-class offshore wind industry in the United States," DOE_5845, the demonstration projects would "verify innovative designs and technology developments and validate full performance and cost under real operating and market conditions." DOE_3236. DOE's goal was "to assess a range of offshore wind plant systems utilizing innovative technologies that are optimized for locations and where future development has the highest probability of commercial viability." DOE_5911.

After a competitive process, DOE opted to fund, among others, Project Icebreaker ("Icebreaker"). The Lake Erie Energy Development Corporation ("LEEDCo") proposed Icebreaker as a demonstration project to construct and install six, 413-foot-diameter wind turbines in Lake Erie. DOE_3267–70, 3274. The turbines would sit about eight miles north of Cleveland, Ohio. DOE_3267–68. If completed, Icebreaker would not only be "the first installation of offshore wind anywhere in the Great Lakes," but also "the first installation of wind turbines in a freshwater ecosystem anywhere" in the world. DOE_482. According to LEEDCo, Icebreaker would "enable the development of infrastructure for offshore wind installations and operations throughout Lake Erie" and help "establish[] a permitting protocol that [would] be the basis for future projects in state waters across the Great Lakes." DOE_2.

Under DOE's cooperative agreement with LEEDCo, the agency would provide about 22.5 percent of the project's total funding; LEEDCo would source the remainder elsewhere. DOE_5686. Importantly, the agreement calls for DOE to divide its funding into five distinct "budget periods." ECF No. 23-3 ¶ 4. After each stage, DOE retains discretion to decide whether

4

to move forward with the project—what the cooperative agreement calls "Go/No Go decision points." DOE_5676; *see also* DOE_5684–85; DOE_5731–33.

In May 2016, DOE authorized Icebreaker to proceed from Budget Period 1 to Budget Period 2. Under the agreement, the tasks for Budget Period 2 included conducting NEPA review and obtaining a CWA Section 404 permit. DOE_5722–23. In August 2017, DOE, along with the Corps as a cooperating agency, released a draft EA for public comment. DOE_3264–66. Then in September 2018, the agency released its final EA and FONSI. DOE_3248–428. While NEPA review was underway, LEEDCo applied for a CWA Section 404 permit, for which the Corps issued a public notice and received comments in fall 2017. UACE_3180. The Corps approved the permit in January 2019 and released a Memorandum for the Record documenting its analysis. As part of that analysis, the Corps, "as a cooperating agency, adopt[ed] the Department of Energy (DOE) Final Environmental Assessment (FEA) and Finding of No Significant Impact (FONSI) . . . [and] to reduce duplication of effort and paperwork . . . incorporate[d] by reference [those documents'] findings." USACE_81. But at the time of briefing, several other Budget Period 2 tasks remained incomplete—and for that matter, remain incomplete even now. *See* ECF No. 23-3 ¶ 6; ECF No. 35-1 ¶ 4. So DOE has yet to conduct Go/No-Go review for Budget Period 3 or authorize the project to proceed to that period. *See* ECF No. 23-3 ¶ 7; 35-1 ¶ 3.

Plaintiffs, two bird advocacy organizations, fear Icebreaker's impact on the region's bird and bat populations. Indeed, if constructed, the project would lie at the heart of the Lake Erie Central Basin Global Important Bird Area and next to the Cleveland Lakefront Important Bird Area and the Lake Erie Western Basin Important Bird Area. ECF No. 11-2 ¶ 8. They sued Defendants—DOE's Secretary, the Secretary of the Army, and the head of the Corps—in December 2019, alleging that DOE's final EA and FONSI are deficient and that the project requires an EIS

5

that would more thoroughly consider these potential impacts.  They also contend that the project's Section 404 permit violates applicable guidelines and regulations.  The parties have cross-moved for summary judgment.

## II.     Legal Standard

A district court evaluating motions for summary judgment in an Administrative Procedure Act ("APA") case "sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Its only task is to decide "whether, as a matter of law, the evidence in the administrative record supports the agency's decision."  *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 58 (D.D.C. 2019).  The APA's deferential arbitrary-and-capricious standard limits such review.  *See* 5 U.S.C. § 706(2)(A).  Generally, an agency's action is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Sierra Club v. Van Antwerp,* 661 F.3d 1147, 1154 (D.C. Cir. 2011).

This deference, however, is not absolute.  Instead, courts must "ensure that the [agency] has examined the relevant data and has articulated an adequate explanation for its actions.'"  *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009).  But courts may not "substitute [their] judgment for that of the agency."  *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (quotation omitted).

### III. Analysis

Plaintiffs challenge both DOE's final EA and FONSI under NEPA and the Corps' issuance of LEEDCo's Section 404 permit under the CWA. They first contend that NEPA compelled DOE to prepare an EIS for Icebreaker, and its FONSI violates the statute. Alternatively, they argue that even if an EA would have sufficed, the one DOE prepared still violated NEPA. Plaintiffs also argue that the Corps violated the CWA by issuing LEEDCo a Section 404 permit that failed to comply with Section 404's Guidelines.

In response, DOE first argues that Plaintiffs' NEPA claims are unripe. But to the Court, the problem is instead that Plaintiffs lack standing to bring them because they cannot (at least now) show an adequate causal link between the purported NEPA error and any particularized injury they suffered. Thus, the Court will dismiss those claims for lack of subject-matter jurisdiction. As for Plaintiffs' CWA claim, the Court finds that it fails on the merits, and so the Court will enter judgment for the Corps on that claim.

#### A. Plaintiffs Lack Standing on their NEPA Claims

Plaintiffs' NEPA claims are twofold. First, they contend DOE violated NEPA by failing to prepare an EIS, instead publishing only an EA and FONSI. Second, they argue the EA and FONSI themselves violate NEPA. DOE argues these claims are unripe because it has yet to authorize funding to install Icebreaker and will not so authorize until Budget Period 4 under the agency's cooperative agreement with LEEDCo. The Court agrees the NEPA claims are not justiciable, but for a different reason. In the Court's view, the problem is one of standing.[2]

---

[2] To be sure, the conceptual line between standing and ripeness is a thin one. But "[c]onstitutional ripeness [has been] 'subsumed' by standing's injury-in-fact requirement." *Conference of State Bank Supervisors v. Off. of Comptroller of Currency*, 313 F. Supp. 3d 285, 299 (D.D.C. 2018) (quoting *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012)). DOE

"[T]he irreducible constitutional minimum of standing" is that "the plaintiff must have suffered an injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; "there must be a causal connection between the injury and the conduct complained of" that is "fairly traceable to the challenged action of the defendant"; and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotations omitted) (cleaned up). And when an association—like both Plaintiffs—sues on behalf of its members, it has standing so long as "(1) at least one of its members would have standing to sue in [its] own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Although it couches its arguments in terms of ripeness, DOE effectively challenges Plaintiffs' standing on both the injury-in-fact and causation elements. *See* ECF No. 22 at 18 n.10.

In general, a threatened future injury may satisfy the injury-in-fact requirement "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 415 n.5 (2013)). But "[i]t is settled law that 'an agency's failure to prepare (or adequately prepare) an [Environmental Impact Statement] before taking an action with adverse environmental consequences' constitutes the 'archetypal procedural injury' redressable under Article III." *Sierra Club v. FERC*, 827 F.3d 36, 43 (D.C. Cir. 2016) (quoting *WildEarth*

---

acknowledges as much, suggesting in a footnote that its "ripeness problem could also be stated as one of standing. Plaintiffs have not suffered any 'actual or imminent' injury that is 'fairly traceable' to any Department of Energy Action." ECF No. 22 at 18 n.10 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 415 n.5 (2013)). Especially given the D.C. Circuit's precedent analyzing organizational standing in NEPA cases, the Court sees the issue as one of standing.

*Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). In such procedural-rights cases, "courts relax the normal standards of redressability and imminence," *Sierra Club*, 827 F.3d at 65, and a plaintiff need only "show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)). Thus, a plaintiff must "tether[]" its NEPA injury "to some concrete interest adversely affected by the procedural deprivation." *WildEarth Guardians*, 738 F.3d at 305.

Thus, once a NEPA plaintiff adequately shows that an agency action threatens its particularized interests, standing tends to hinge on the *causation* element. In NEPA cases, "an 'adequate causal chain' contains two links: 'one connecting the [deficient or] omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an [adequate] EIS,' and 'one connecting that substantive decision to the plaintiff's particularized injury.'" *Sierra Club*, 827 F.3d at 44 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668).

Causation, not injury, is the problem here. Plaintiffs have shown a cognizable, particularized interest sufficient for Article III standing under Circuit precedent: wind turbines kill birds, so Icebreaker's operation would harm their members' aesthetic and recreational interests in the region's bird population. *See* ECF No. 11-2 ¶¶ 14–16; ECF No. 11-3 ¶¶ 12–13; ECF No. 11-4 ¶¶ 13–14.[3] But they have not linked the causal chain between a purported NEPA error and those

---

[3] S*ee also WildEarth Guardians*, 368 F. Supp. 3d at 61 ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)); *Conservation L. Found. v. Pritzker*, 37 F. Supp. 3d 234, 243 (D.D.C. 2014) ("[T]he economic, recreational, and aesthetic harm that [plaintiff] says would result from [an action subject to NEPA review] is 'undeniably a cognizable interest for purpose of standing.'" (quoting *Lujan*, 504 U.S. at 562–63)).

9

interests, because DOE has made no decision based on its NEPA analysis. Indeed, DOE selected Icebreaker for funding *before* conducting any NEPA analysis—a decision Plaintiffs do not challenge. When Plaintiffs sued, Icebreaker remained in Budget Period 2—as it apparently is to this day—with no Go/No-Go decision about whether to proceed to Budget Period 3. For that reason, Plaintiffs have not shown that DOE has made a decision that "may have been wrongly decided *because of* the lack of" adequate NEPA review. *See Sierra Club*, 827 F.3d at 43 (emphasis added). Thus, any causal chain remains incomplete. And without that completed chain, Plaintiffs assert only "a procedural right *in vacuo* . . . insufficient to create Article III standing." *WildEarth Guardians*, 738 F.3d at 305.[4]

### B. The Army Corps' Decision to Issue a Section 404 Permit Was Not Arbitrary and Capricious

The Corps does not challenge the justiciability of Plaintiffs' CWA claim, and the Court sees no reason to question it. *See, e.g.*, *Conservation L. Found.*, 37 F. Supp. 3d at 246 (reaching the merits of the plaintiff's Magnuson-Stevens Act challenge despite finding its NEPA claims unripe because the "[d]efendants ha[d] 'completely and finally implemented [their] procedures' under the MSA, which [plaintiff] claim[ed] were violated" (quoting *Wyoming Outdoor Council*, 165 F.3d at 51)). So the Court can proceed to the merits.

As explained above, before issuing a Section 404 permit, the Corps must conclude that (a) there is "no practicable alternative" to the proposal "which would have less adverse impact on the

---

[4] DOE goes further, arguing that Plaintiffs' NEPA claims will not be justiciable until it authorizes the project to proceed to Budget Period *4*. It points to *Wyoming Outdoor Council v. U.S. Forest Service*, where the D.C. Circuit held that NEPA claims do not ripen until the agency "reaches the critical stage of a decision which will result in the irreversible and irretrievable commitment of resources to an action that will affect the environment." 165 F.3d 43, 49 (D.C. Cir. 1999) (quotation omitted). According to DOE, this will not occur until it irretrievably commits resources "to project *installation*" during Budget Period 4. *See* ECF No. 22 at 16. But the Court need not resolve that question to conclude that Plaintiffs lack standing.

10

aquatic ecosystem," 40 C.F.R. § 230.10(a); (b) the proposal "will [not] cause or contribute to significant degradation" of U.S. waters, *id.* § 230.10(c); and (c) the proposal is not "contrary to the public interest," 33 C.F.R. § 320.4(a)(1). *See also* § 320.4(a)(1) (incorporating compliance with the Section 404 Guidelines into public-interest review). Plaintiffs challenge the Corps' decision to issue LEEDCo a Section 404 permit as arbitrary and capricious on two fronts. First, they contend that the Corps' public-interest review was lacking because it "relied entirely on the findings of DOE and its contractors to conclude" that Icebreaker was "'not contrary to the public interest'" and otherwise "'complie[d] with the [Section 404(b)(1)] Guidelines.'" ECF No. 11-1 at 49 (quoting USACE_131). More specifically, Plaintiffs argue that the Corps failed to give "full consideration" to the Fish & Wildlife Service's ("FWS") view that "'there is great uncertainty'" about the extent of potential risks to bids and bats. *Id.* (quoting USACE_2978). Second, Plaintiffs contend that the Corps failed to "adequately examine an alternative that would include a defined post-construction monitoring system for bird and bat collisions with Icebreaker." *Id.* at 51. The Court is not persuaded on either count.

            **1.**     **Section 404 Guidelines and Public-Interest Review**

Plaintiffs first argue that the Corps' public-interest review was deficient because it "relied entirely on the findings of DOE and its contractors" in the final EA while failing to "give full consideration to the views of [FWS] on fish and wildlife matters," as its regulations require. ECF No. 11-1 at 49–50 (quoting 33 C.F.R. § 320.4(c)); *see also* USACE_148–49, 152, 164–66 (accepting DOE's "responses, analyses, and conclusions" on various comments). According to Plaintiffs, the Corps should have "defer[ed] to FWS's expert judgment" that there was "great uncertainty as to how many birds and bats are using the airspace in and around the project area," meaning it lacked sufficient information to conclude whether Icebreaker's discharge would "contribute to

11

significant degradation" of U.S. waters under the Section 404 Guidelines. ECF No. 11-1 at 49 (citing 40 C.F.R. §§ 230.10(c), 230.12(a)(3)). Affording the Corps proper deference, the Court sees no error.

To be sure, Plaintiffs do not argue that the Corps may not, as a cooperating agency, incorporate a lead agency's NEPA analysis into its Section 404(b)(1) public-interest review, as it did here. *See* ECF No. 25 at 51 (acknowledging "[t]he Corps is permitted to adopt a NEPA document for purposes of its own public interest and Guidelines consistency review"). Indeed, the Corps' regulations expressly authorize that approach. *See* 33 C.F.R. § 230.21. Moreover, the Corps' detailed Memorandum for the Record reveals that, despite incorporating DOE's analysis in the EA, it still independently reviewed the record and came to its own conclusion that, considering all the project's potential effects, it was not contrary to the public interest. *See* USACE_131. And more specifically, although it relied on DOE's discussion of Icebreaker's potential impacts on wildlife, including birds and bats, the Corps independently concluded that "the proposed project [would] have a neutral effect on" fish and wildlife.[5]

Plaintiffs' argument is narrower. They say the Corps acted arbitrarily and capriciously by adopting DOE's analysis and concurring in its views instead of deferring to FWS's view that the level of risk to bird and bat populations is "uncertain[]" based on available data. *See* USACE_2978, 2986. According to Plaintiffs, if the Corps had agreed with FWS's comment, it

---

[5] *See* USACE_110. *Cf. Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 2022 WL 5434208, at *10 (D.D.C. Oct. 7, 2022) (the Corps need not "duplicate studies or analyses already completed . . . to consider certain effects [of] activities associated with the Project"); *Hoosier Env't Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1062–63 (7th Cir. 2013) ("Especially when as in this case the Corps . . . weigh[s] in on [another agency's] analysis of the relative benefits and costs of a proposed . . . project, it should be able to rely on that analysis, if it is a reasonable analysis, while conducting its own analysis of those factors that are within its competence.").

might have resolved that it lacked "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the Section 404(b)(1)] Guidelines." *See* ECF No. 11-1 at 50 (quoting 40 C.F.R. § 230.12(a)(3)). And because the Corps' regulations require it to "give full consideration to the views of [FWS] on fish and wildlife matters," its departure from FWS's views on this issue was unreasonable. *Id.* (quoting 33 C.F.R. § 320.4(c)).

The Court perceives no error in how the Corps proceeded for several reasons. First, and most important, "the Corps is not bound to agree with the conclusions reached by [FWS]," but need only give "full consideration to their comments." *Sierra Club v. U.S. Army Corps of Eng'rs*, 772 F.2d 1043, 1054 (2d Cir. 1985). By conflating "full consideration" with "deference," Plaintiffs overstate the Corps' obligation. *See* ECF No. 11-1 at 50. The record shows that the Corps considered FWS's comments and simply agreed with DOE's response to those comments during its NEPA review. *See* USACE_152, 164–66. The Corps' regulations require no more.

Second, it is not clear whether (or to what degree) FWS's comment about its uncertainty applied to the final EA, anyway. The Corps incorporated the *final* EA into its Memorandum for the Record. *See* USACE_81. The FWS comment Plaintiffs cite addressed the *draft* EA. *See* USACE_2978. And DOE modified the draft EA based on FWS's comments. DOE_3333–34, 3355–58, 3457, 3478–79; *see* 3495–99 (summary of DOE's responses to FWS's comments).

Third, even if the Corps had concluded that the risk Icebreaker posed to bird and bat populations was uncertain, the Court fails to see how that doubt would have led the Corps to conclude it lacked "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the Section 404(b)(1)] Guidelines," as Plaintiffs suggest. *See* ECF No. 11-1 at 50 (quoting 40 C.F.R. § 230.12(a)(3)). The only Guideline to which Plaintiffs direct the Court that addressed limits on a project's "potential effects on wildlife," *see id.*, is 40 C.F.R.

§ 230.10(c). But that Guideline bars the Corps from issuing a permit only when a project's "*discharge of pollutants*" would "contribut[e] to significant degradation" of U.S. waters, including "[s]ignificantly adverse effects . . . on . . . wildlife." § 230.10(c)(1) (emphasis added). Nothing in the record suggests that Icebreaker's "discharge of pollutants" would have any impact on bird and bat populations. Thus, any uncertainty about risk to bird and bat populations from the project's turbines would not have left the Corps unable "make a reasonable judgment as to whether [Icebreaker's] proposed discharge will comply with" the relevant guidelines.

Of course, "fish and wildlife values" are among the many relevant factors the Corps must consider in conducting its public-interest review. *See* 33 C.F.R. § 320.4(a)(1) (listing potentially relevant factors and explaining that public-interest review is a "balancing process"). But Plaintiffs do not explain how FWS's uncertainty about the risk to bird and bat populations, even if adopted by the Corps, would suffice to render the Corps' overall, multi-factored public-interest determination arbitrary and capricious. And the Court does not see how it would.

Thus, the Court finds the Corps' conclusion that Icebreaker would not be contrary to the public interest to be reasonable, and not arbitrary and capricious.

### 2. Reasonable Alternatives

Plaintiffs also argue that the Court should set aside LEEDCo's Section 404 permit because the Corps failed to consider a project alternative that would include a predefined, post-construction system to monitor bird and bat collisions with Icebreaker. To satisfy its obligation to determine whether any "practicable alternative to the proposed discharge" exists that "would have less adverse impact on the aquatic ecosystem," the Corps need consider options that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a), (a)(2). According to the Guidelines,

14

practicable alternatives might include "[a]ctivities which do not involve a discharge of dredged or fill material into waters of the United States or ocean waters" or "[d]ischarges . . . at other locations." *Id.* § 230.10(a)(1).

The problem for Plaintiffs is that the Corps had no duty to consider a proposal involving post-construction collision monitoring because it does not offer an "alternative *to the proposed discharge*," and thus exceeds the ambit of Section 404 analysis. *See* 40 C.F.R. § 230.10(a) (emphasis added).[6] The Guidelines make clear that the Corps need only consider alternatives to the discharge itself—not to any environmentally damaging aspect of the project. *See id.* § 230.10(a)(1). Even accepting Plaintiffs' questionable proposition that the post-construction monitoring proposal *is* an "alternative" that "would have less adverse impact" on wildlife populations (instead of one that would simply measure those impacts better), it still has nothing to do with Icebreaker's "discharge" into Lake Erie.

In response, Plaintiffs point out that the Corps must consider impacts to "[w]ildlife associated with aquatic ecosystems," like birds, in making factual determinations under Section 230.10, including its evaluation of whether a practicable alternative "would have less adverse impact on the aquatic ecosystem."[7] 40 C.F.R. § 230.10(a). True, but the Guidelines still confine that analysis

---

[6] The Court holds here that Plaintiffs' post-construction monitoring proposal does not offer a practicable alternative for purposes of Section 404 analysis but does not address whether it is a reasonable alternative for NEPA purposes. *See Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1190–91 (10th Cir. 2002) (observing that the Corps' permitting authority is "different and more narrow" than NEPA and concerns only "the collective effect[s] of . . . discharges or fills of material").

[7] *See* ECF No. 26 at 53–54; 40 C.F.R. § 230.11 (listing factors the Corps must consider when deciding whether a proposed discharge complies with the § 230.10 restrictions, including "the nature and degree of effect that the proposed discharge will have, . . . on the structure and function of the aquatic ecosystem and organisms"); *id.* § 230.32 (defining potential impacts on wildlife associated with aquatic ecosystems).

to effects stemming—directly or indirectly—from the discharge itself.  ECF No. 26 at 53 (citing 40 C.F.R. § 230.32); *see* 40 C.F.R. § 230.32(b) (directing the Corps to consider, among other things, that "[t]he *discharge of dredged or fill material* can result in the loss or change of breeding and nesting areas, escape cover, travel corridors, and preferred food sources" and "[t]he availability of *contaminants from the discharge of dredged or fill material* may lead to the bioaccumulation of such contaminants in wildlife" (emphasis added)).  Plaintiffs' insistence that the Corps must consider project alternatives untethered to the discharge of pollutants flouts the Guidelines' text and ignores the CWA's limited purpose.

For these reasons, Plaintiffs have identified no error in the Corps' analysis of practicable alternatives.

**IV.   Conclusion**

For all these reasons, the Court will dismiss Plaintiffs' NEPA claims because Plaintiffs lack standing.  And it will grant in part Defendants' motion for summary judgment on Plaintiffs' CWA claim and deny Plaintiffs' cross-motion for summary judgment on the same.  A separate order will issue.

/s/ Timothy J. Kelly  
TIMOTHY J. KELLY  
United States District Judge

Date: September 26, 2023